UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

vs.                                                          No. 6:21-CR-17-ORL-40EJK

JACQUAVIUS DENNARD SMITH
    a/k/a 9lokkNine
    a/k/a GlokkNine

**SENTENCING MEMORANDUM AND MOTION FOR DEPARTURE/VARIANCE**

**Introduction**

The Defendant, Jacquavius Dennard Smith, by and through his undersigned counsel,

respectfully submits this sentencing memorandum and motion for this Honorable Court's

consideration. Jacquavius requests this Court, after careful consideration of the applicable

guideline range and the factors in 18 U.S.C. § 3553, to grant a modest downward departure

and/or variance.  Alternatively, he seeks a sentence at the low end of the calculated guidelines

with a recommendation for placement in a Bureau of Prisons institution with the Residential

Drug Abuse Program (RDAP) in Florida.

**Procedural History**

On February 3, 2021, a federal grand jury in the Middle District of Florida, Orlando

Division, returned a three-count Indictment naming Jacquavius Dennard Smith, a/k/a

9lokkNine, a/k/a GlokkNine as the defendant.  On March 17, 2021, a federal grand jury in the

Middle District of Florida, Orlando Division, returned a four-count Superseding Indictment

naming Jacquavius Dennard Smith, a/k/a 9lokkNine, a/k/a GlokkNine as the defendant.

On July 12, 2021, the government filed a three-count Superseding Information in the Middle District of Florida, Orlando Division, naming Jacquavius Dennard Smith, a/k/a 9lokkNine, a/k/a GlokkNine as the defendant.  Count One charged Possession of Unregistered Firearm, occurring between on or about July 7, 2019, and July 24, 2020, in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871.  Count Two charged Aggravated Identity Theft, occurring between on or about March 24, 2021, and April 15, 2021, in violation of 18 U.S.C. §§ 1028A(a)(1).  Count Three charged Felon in Possession of a Firearm and Ammunition, on or about June 21, 2021, an offense committed while the defendant was on release pursuant to an order dated March 9, 2021, from the United States District Court, Middle District of Florida, Case No. 21-cr-17-PGB-EJK, which order notified the defendant of the potential effect of committing an offense while on pretrial release, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and 3147(1)

On July 13, 2021, the defendant appeared before United States Magistrate Judge Embry J. Kidd and pleaded guilty to Counts One, Two, and Three of the Superseding Information, pursuant to a written Plea Agreement. On this same day, United States District Judge Paul G. Byron accepted the defendant's plea of guilty and adjudicated him guilty.

## Advisory Guidelines Range

If his objections are granted, Jacquavius scores at an Offense Level 24 with a Criminal History III.  The guideline imprisonment range is 70-97 months.

## The Crimes of Conviction

For Count I of the Superseding Information, Jacquavius, who is a convicted felon, is guilty of hiding a stolen semi-automatic rifle and ammunition in his grandparent's garage.  Since the rifle's barrel was under 16 inches in length it was supposed to be registered with the

2

National Firearms Registration and Transfer Record.  Additionally, the rifle magazine is classified as "high capacity" because it could hold 30 rounds of ammunition.

Jacquavius's conviction for Count II arises out of a Payroll Protection Plan (PPP) loan application he submitted to the Small Business Administration.  He used a bank account in his own name and the personal identifiers of an innocent victim.  Jacquavius received $10, 216 in loan proceeds that he did not deserve.  After the fraud was discovered, law enforcement recovered $7,216 from his bank account.

In Count III, Jacquavius possessed a handgun and ammunition while on pre-trial release .  The weapon was located in his personal belongs in the apartment where he was staying.  Police also found several devices called "auto sears" which can modify the trigger pull of a firearm to make it fire automatically like a machine gun.

### The Rap Artist Known as "9lokkNine"

Jacquavius Dennard Smith, like rap and hip-hop pioneers Snoop Dog, Dr. Dre, Jay-Z, and The Notorious B.I.G., maintains a "gangster persona" as the rapper "9lokkNine" which is pronounced "Glock Nine." He raps about violence, guns, drugs, and racial inequality in the Black community.  Admittedly, some of the things Jacquavius raps about are based on personal experience.  But a lot of what you hear is not about him.  As explained by Andrea Dennis in Poetic (In)Justice? Rap Music Lyrics as Art, Life and Criminal Evidence, 31 COLUM. J.L. & ARTS 25 (2007):

> "Rap lyrics are not necessarily autobiographical statements; rather, rap music is
> a well-recognized musical genre that often utilizes exaggeration, metaphor, and
> braggadocio for the purpose of artistic expression.  Because rap lyrics may falsely
> or inaccurately depict real-life events, they should not necessarily e understood
> as autobiographical statements."

Thanks to music videos, performers create an exaggerated "gangster

persona" with profane and violent lyrics, flashy clothes, exotic cars, sexy woman, gold, jewelry,

stacks of cash, and plenty of guns.  9lokkNine's videos are no different and could be easily

harvested for what would otherwise be viewed as incriminating evidence. Yet, courts that have

addressed this issue have found little to no probative value with this practice.  See Exhibit A,

Opinion in *U.S. v. Bey*, 2017 WL 1547006 (E.D.Mich. March 7, 2019).

> "We detect little to no probative value to the [rap] lyrics whatsoever. The
> difficulty in identifying probative value in fictional or other forms of artistic self-
> expressive endeavors is that one cannot presume that, simply because an author
> has chosen to write about certain topics, he or she has acted in accordance with
> those views. One would not presume that Bob Marley, who wrote the well-
> known song 'I shot the Sheriff," actually shot a sheriff, or that Edgar Allan Poe
> buried a man beneath his floorboards, as depicted in his short story 'The Tell-
> Tale heart,' simply because of their respective artistic endeavors on those
> subjects."   *State v. Skinner*, 95 A.3d 236, 251 9N.J. 2014)

Guns, whether fake or real, are brandished, pointed or waived and are <u>everywhere</u> in

rap videos.  Sure the guns make the performers look menacing but they are also necessary for

self-defense. To put this in context, do a Google search of "rap artist shot in Florida" and you

will learn that  "SpottemGottem", "Lee Kahn", "WizDaWizard", "XXXTentacion", "Main Rugar",

"Jahjah", "Kodak Black", "Baby Blue" and "Spinabenz" where all shot at, shot or killed by

firearms in 2021. This phenomenon is best explained by Rocco Valdes, Jacquavius's manager:

> "In 2018, he (Jacquavius) signed a $2 Million record label deal with Republic
> Records through Universal Music which is home to some of the biggest artists in
> the world.  For him it was a gift and a curse. *Where he's from that instantly put a*
> *target on his back.*  Months before he went to jail he was at the mall just
> shopping and someone shot at him trying to kill him. It's a sad reality but that is
> what he has to deal with being successful where he is from.  He now
> understands when he gets out of jail he has to relocate."
> **See Exhibit B, Letters in Support,  Valdes Letter.**

4

Moreover, the threats against Jacquavius have impacted his family:

> "Even while being incarcerated Jacquavius is filed with sadness and much regret because of the incidents that have occurred, his cars being shot up, his cousins house being shot up people shooting at him outside the mall, I witnessed Jacquavius living in fear of his life and our lives because Jacquavius lives with me, my daughter Rodriyana and I also have a 16 year old son named KB, and my 2 year old granddaughter his child J.S. This is why we moved from the west side far out to the east side because everyone knew where we lived and we felt like it wasn't safe anymore at the previous address."
> **See Exhibit B, Letters in Support,  Tonya Hill Letter.**

As Jacquavius Smith explains:

> "By the time I signed [with his record label] I was 18 with 2 million dollars.  My mother was staying on Silver Star still in like 3 months after I signed my mother house had got shot up. It's like when I started getting notices I start receiving hatred…I been shot at numerous of times even at Millenia Mall in broad daylight. [1] A detective stop by my mother's house in told her to call me because I was in Miami in told both of us I have a large amount of money on my head [contract]. That's why we are here today because I knowingly broke the law even though it was for my protection.  Because I would rather face my consequences rather than my family facing me in a casket.  I know if I was able to walk ways from this today I would get security and move far away. You honor I would like you to judge me as Jacquavius Smith and not my stage name "9lokknine."
> **See Exhibit C, Letter to Judge Byron from Jacquavius Smith.**

9lokknine has 18.9 million listeners on Spotify, 325 million listens on Soundcloud and over 90 million viewers on YouTube. He has put out over 100 songs and dozens of videos. To get an idea of how rapidly Jacquavius rose up the hip hop/rap ranks, here's a brief summary of his music career.  He released his first mixtape, Kold Face Kold Case with nine tracks on January 2, 2018. He released his second mixtape, Bloodshells Revenge with 18 tracks on April 17, 2018. On May 8, 2018, he released a music video for his single "I Don't Need No Help". On July 23,

---

[1] Mr. Smith was the intended victim according to OPD.
https://www.clickorlando.com/news/local/2020/10/09/orlando-rapper-was-intended-target-in-mall-at-millenia-shooting-police-say/

2018, he released his 17-track mixtape, Loyalty Kill Love. Three months after his *eighteenth*

*birthday* he signed to Cash Money Records and Republic Records for a contract was worth $2

million. [2] On December 19, 2018, he released the 11-track mixtape, Lil Glokk That Stole

Khristmas. In April 2019, he released his single "Party Pooper". He was featured on a YNW Melly

track named "223's", though he was the one to originally release it as a part of his December

2018 mixtape, Lil Glokk That Stole Khristmas. The song became a sensation when it was

popularized by the mobile app TikTok where numerous popular creators took to dancing to the

song.  On October 25, 2019, Jacquavius released his 16-track mixtape Mind of Destruction,

which served as his first official mixtape release on Cash Money and Republic. On February 5,

2020, he released his single "Moods".  He is best known for his song "10 Percent", which

received over 30 million views on YouTube.

## Jacquavius Smith-the Person

While it may not seem the case since he will be imprisoned soon, Jacquavius is a blessed

man.  He has the support of his girlfriend and mother of his daughter, Rodriyana Hill, her

mother, Tonya Hill, his mother Jovita Anthony, his grandparents, Cassandra and Herloia

Anthony, and his uncle Octavius Smith.  See Exhibit B, Letters of Support.

Jacquavius, who is the loving father to his two-year old daughter Ja'Layah Smith.  His

girlfriend Rodriyana states:

> "Throughout these years, I have been able to witness the things Jacquavius has done for others
> including his family, my family, even little kids and strangers that he doesn't know.  Jacquavius
> has always been a fun guy to be around he has such a big heart and is an amazing father. I'm
> thankful he is always there for our child because as a young mother it gets hard mentally and
> physically.  The bond that Jacquavius have with our daughter is something I've never

---

[2] https://hiphop-n-more.com/2018/08/florida-rapper-glokknine-signs-2-million-deal-with-cash-money-records/

experienced before so that is something that I cherish it completes me because they're all I
have besides my mom, little brother and older sister."
**See Exhibit B, Letters in Support,  Rodriyana Hill Letter.**

The letters from his grandparents and Rodriyana's mother demonstrate that he has

compassion for others and is generous to others.  His family and community are important to

him and he has tried to support others whenever possible.  Exhibit D, Photographs of Family

and Friends.

### GROUNDS FOR DEPARTURE

### Jacquavius's Criminal History is Overrepresented

Pursuant to USSG  § 4A1.3(b), "if reliable information indicates that the defendant's

criminal history category substantially over-represents the seriousness of the defendant's

criminal history or the likelihood that the defendant will commit other crimes a downward

departure may be warranted."  Jacquavius spent only about 12 months in jail before being

arrested on his current charges.  PSR  §§ 58-62.  Therefore, his Criminal history is overstated

because he was not previously incarcerated for a substantial time period of time.  *See U.S. v.*

*Santoya*, 493 F.Supp.2d 1075  (E.D. Wisc. 2007) (in drug conspiracy case where defendant

career offender, below guideline sentence imposed where "imposition of guideline

sentence...would have resulted in a defendant who had not previously spent more than about a

year in prison receiving a sentence more than fifteen times that long...an increase of such a

magnitude was greater than necessary" and where "the sentencing commission  has

acknowledged that when career offender status is based on relatively minor drug offenses, the

guidelines may create a sentence greater than necessary"); *U.S. v. Collington*,  461 F.3d 805 (6th

Cir.  2006) (in drugs and gun case where guidelines 188 -235, sentence of 120 months affirmed

in part because "the district court found that, despite Collington's criminal history being at a IV,

Collington has never been in custody for any substantial period of time," having only been

imprisoned for seven months before this crime.")

What is more, all of Jacquavius's  crimes were committed before he turned 21 years old.

PSR  §§ 58-63; *See U.S.  v. Shoupe*, 988 F.2d 440, 447 (3d Cir. 1993) (court may consider

defendant's age and immaturity when priors committed in determining that criminal history

(career offender) over represents history); *U.S.  v. Bowser*, 941 F.2d 1019, 1024 (10th Cir. 1991)

(age and close proximity in time between prior criminal acts provided proper bases to depart

downward from career offender category); *U.S.  v. Senior*, 935 F.2d 149, 151 (8th Cir. 1991)

(defendant only 20 years old when he committed his first predicate offense, a series of

robberies, and D received short sentence for second predicate offense drug charges, obvious

state did not consider D's crimes serious; so downward departure proper).

Moreover, two of the offenses scored against Jacquavius, See PSR  §§ 61 and 62, did not

result in adjudications of guilt.  Instead, adjudication was withheld and he spent a total of 3

days in jail.  Indeed, this fact in itself is a basis for the court to grand a downward departure. *See*

*U.S.  v. Senior*, 935 F.2d 149, 151 (8th Cir. 1991) (defendant only 20 years old when he

committed his first predicate offense, a series of robberies, and D received short sentence for

second predicate offense drug charges, obvious state did not consider D's crimes serious; so

downward departure proper).

### Dual State and Federal Prosecution of Jacquavius

Dual prosecution by both federal and state governments is a circumstance not

considered by the guidelines. *See U.S.  v. Haggerty*, 4 F.3d 901 (10th Cir. 1993).  As referenced

in the §§ 74-76 of the PSR, Jacquavius faces decades in prison if convicted on the state RICO

charges. The attempted murder charges were recently dismissed for lack of evidence by the

state. The specter of unfairness raised by successive state  and federal prosecutions,   justifies a

downward departure.  *See U.S.  v. Koon*, 833 F. Supp. 769, 786 (C.D.Cal. 1993) (aff'd  Koon v.

U.S. , 518 U.S. 81 (1996).

### Jacquavius's Successful Recording Career Warrants a Departure

Even though under USSG § 5H1.5 solid employment is a discouraged basis for a

departure, there are exceptions.  *See U.S.  v. Higgins*, 967 F.2d 841 (3d Cir. 1992) (young age

and stable employment will justify a downward departure if "extraordinary"); *U.S.  v. Alba*, 933

F.2d 1117 (2d Cir. 1991) (long-standing employment at two jobs); *U.S.  v. Jagmohan*, 909 F.2d

61 (2d Cir. 1990) (exceptional employment history and nature of the crime); *U.S.  v. Big Crow*,

898 F.2d 1326, 1331-32 (8th Cir. 1990) (excellent employment record). As demonstrated by his

success in the music industry and the sheer volume of songs he's produced, he's an

exceptionally dedicated performer. See PSR §§ 96-98.

### BOP Residential Drug Abuse Program

While not a departure under the Sentencing Guidelines, Jacquavius's lifelong marijuana

use should qualify him for admission to the Bureau of Prison's Residential Drug Abuse Program

or RDAP.  See PSR § 89. As the Court knows, the program affords successful participants a

sentence reduction of up to one year.  *See* 18 U.S.C. § 3621(e)(2)(B)

### GROUNDS FOR A VARIANCE

Pursuant to *United States v. Booker*, 543 U.S. 220, 245-67 (2005), a court is now

unencumbered in its ability "to consider every convicted person as an individual and every case

as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime

and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (*quoting Koon v.*

*United States*, 518 U.S. 81 (1996)).  The significance of this perspective, with its emphasis on the

individual and the unique circumstances of his case, cannot be overstated in the instant case.

Indeed, Jacquavius's story should not be reduced to a rigid sentencing matrix. Placing

Jacquavius's narrative within the statutory framework of § 3553(a) necessarily underscores this

tenet.   To guide a court's discretion, section 3553(a)(2), requires sentencing courts to consider

not only the advisory Guidelines range, but also the facts of a specific case through the lens of

seven factors found 18 U.S.C. § 3553(a)(1)-(7). Against the backdrop of these seven statutory

factors, Jacquavius respectfully submits that a variance is warranted in his case.

### The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The significance of the first § 3553 factor is its comprehension that a consideration of a

defendant's criminal conduct cannot disregard the life he has led beyond his crime.

### 1.    Jacquavius's History and Characteristics

As detailed in the Presentence Report and letters from his family and friends, Jacquavius

has done a lot of good in his life despite having a difficult childhood.

> "Your Honor I come from a Section 8 Apartment on Mercy Drive known today as
> Windsor Cove.  My mother Jovita Anthony has 4 boys and we stayed there from
> when I was a toddler until I was like 9 years old. I grew up misunderstood as a
> child. At times I used to think I wasn't loved.  I still feel that way today as I'm
> standing before you.  My father Larry Smith was never in my life growing up.
> Sometimes I questioned was I not good enough for my father to be there for me!
> Times when he weren't in prison he would call to play with my mind ask me
> what I want for Christmas and when Christmas came my father was nowhere to
> be found. As a kid watching my other brothers' fathers drop off their gifts while I
> wait for my dad to never show up hurt me in ways I could never explain. It just

built up anger and I started doing careless things."
**See Exhibit C, Letter from Jacquavius Smith to Judge Byron.**

Jacquavius' struggles with his father's incarceration and being raised by his young mother in an economically distressed neighborhood is a factor for a downward variance. *See Landrigan v. Schriro* 441 F.3d 638, 648 (9th Cir. 2006) ("Where a defendant's crime is attributable to a disadvantaged background or emotional or mental problems the defendant is less culpable than one without the excuse.") While his mother did the best she could to raise four children, Jacquavius "turned to the streets" and started hanging with the wrong group of young men.   See Exhibit B, Jovita Anthony Letter.  Unfortunately, this led to a slew of arrests, use of marijuana and affiliation with the wrong people.

Jacquavius is only 21 years old.  His young age could arguably be a basis for a variance since he's not matured to make sound decisions.  The fact that he had a firearm and ammunition in his own room, while subject to search at any time by Pretrial Services demonstrates an utter lack of sophistication and maturity.

### 2.    The Nature of Jacquavius's Conduct

Jacquavius takes responsibility for the firearms he is charged with possessing and the fraud he perpetrated.  He has hurt his music career, his family and his community and is very sorry. Nevertheless, Jacquavius submits there are mitigating factors concerning his conduct.  As a preliminary matter, his possession of firearms must be viewed in the context of the numerous times rappers have been targeted for death.   While legally wrong, he kept the guns around as a measure of self-defense and defense of his family. Possession of firearms for a non-criminal purpose has been found to be adequate grounds for a downward variance. *See U.S. v. Mahan* 2007 WL 1430288 (10th Cir. 2007) (unpub.) ( where defendant convicted of felon in possession,

11

77-month guideline sentence reversed because district court refused to consider defendant's asserted motive for carrying the shotgun; namely to use as a club to protect himself and his wife after he had just been beaten, which is a relevant "circumstance" under a *Booker* analysis); *U.S. v. Williams*, 432 F.3d 621 (6th Cir. 2005) (in felon in possession case, departure to 24 months from 48 months granted in part because defendant possessed firearm for self-defense in light of threats he had received). The firearms were stored in his bedroom and at his grandparents' home and have not been traced to any violent crimes.

Police located 13 auto sears in a coat belonging to Jacquavius on June 21, 2021. See PSR § 32. If counted as firearms, Jacquavius offense level is increased by 4 levels under USSG § 2K2.1(b)(1)(B). Under Title 26 U.S.C. §5845(b), "auto sears" which are fabricated metal blocks meet the definition of a machine gun. Essentially an auto sear is just a gun part that standing alone, can do no one any harm and is incapable of shooting a projectile. Accordingly, because Jacquavius' sentence is being increased for what are really not functioning firearms, a downward variance is in order.

### B.      The Need for the Sentence Imposed

#### 1.      To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense

Jacquavius is fully aware how serious his crimes are. Anytime there are guns there is the potential for someone to be hurt or killed. He also knows how terrible the victim feels whose identity was stolen. He understands he is going to prison and respects whatever decision the Court makes regarding his term of imprisonment.

### 2.     To afford adequate deterrence to criminal conduct

The principle of general deterrence is based on the unsupported premise that lengthy

prison sentences deter crime. This faulty conception has resulted in the mass incarceration of

individuals in the United States.  For the past 40 years, the United States has been engaged in a

vast, costly social experiment. It has incarcerated a higher percentage of its people, and for a

longer period, than any other democracy. In fact, with 5 percent of the world's population, the

U.S. is home to 25 percent of its prisoners. There are five times as many people incarcerated

today than there were in 1970. . . [The] archipelago of prisons and jails costs more than $80

billion annually — about equivalent to the budget of the federal Department of Education.

Dr. Oliver Roeder et al., What Caused the Crime Decline?, Brennan Center for Just., 22-23 (Feb.

12, 2015), available at https://www.brennancenter. org/publication/what-caused-crime-

decline.

The condition of mass incarceration is especially troubling since there is no correlation

between punishment and reductions in crime. See id; see also Gary Kleck and J.C. Barnes,

Deterrence and Macro-Level Perceptions of Punishment Risks:  Is There a "Collective Wisdom"?,

59 Crime & Delinquency 1006, 1031-33 (2013).  Kleck and Barnes' study concludes:

there is generally no significant association between perceptions of punishment levels and the

actual levels of punishment that the criminal justice system achieves. This in turn implies that

increases in punishment levels do not routinely reduce crime through general deterrence

mechanisms, because the fundamental link between actual punishment levels and perceptions

of punishment levels appears to be weak to nonexistent.  Id. at 1031. The United States

Department of Justice agrees with the conclusion that incarcerating defendants is not an

effective means of deterrence.  *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, <u>Five Things About</u>

<u>Deterrence </u>(July 2014). In fact, the Department of Justice finds that even increasing the severity

of punishment does little to deter punishment. *See id.*

### 3.      To protect the public from further crimes of the defendant

Having established that prison sentences, regardless of length, has no impact on general

deterrence, this section demonstrates that the § 3553(a) factor of specific deterrence also

supports Jacquavius's request for a variance. This section focuses on studies establishing that

incarceration has no effect on recidivism.  As in the case of general deterrence, the empirical

evidence does not establish a relationship between sentence length and specific deterrence,

regardless of the type of crime. *See* <u>National Institute of Corrections, Myths and Facts, Why</u>

<u>Incarceration is Not the Best Way to Keep Communities Safe</u> (2016). As the following discussion

establishes, the best available evidence establishes that imprisonment does not reduce

recidivism more than noncustodial sanctions.

A 2016 study conducted by the National Institute of Corrections (NIC) establishes three

critical tenets regarding incarceration and specific deterrence. First, incarceration has a

negligible impact on crime prevention.  Instead, a longer prison sentence may actually lead to a

greater risk of recidivism. There is strong evidence that prison - by disrupting education and

employment, reducing prospects for future employment, weakening family ties and exposing

less serious offenders to older more serious offenders - leads to increased recidivism.

Moreover, harsh penalties do not improve the long-term outcomes of the offender.

Longstanding research has found that imprisonment brings about negative individual-level

changes that can harm re-integration upon release. National Research Council. <u>The Growth of</u>

Incarceration in the United States: Exploring Causes and Consequences, (Nat'l Acad. Press

2014), available at. https://doi.org/10.17226/1861; see also Friedrich Nietzsche, The Genealogy

of Morals, essay 2, Par. 14 (1887).

Finally, the 2016 study concludes that community correction programs are more

effective than incarceration in reducing recidivism. Thus, the most effective to promote public

safety and ensure that convicted persons can lead law-abiding lives is through broad use of

non-incarceration sentences, especially since "incarceration does little to change a person's

behavior" and persons sentenced to prison have higher recidivism rates than those sentenced

to community corrections.

This last tenet is especially critical in Jacquavius's case. Indeed, Jacquavius's history and

characteristics demonstrate that he has been a valuable member of his family and community.

As this memorandum demonstrates, he has made a real and tangible difference in the lives of

his family and others.

**4.      To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

Jacquavius has a history of drug and alcohol abuse and would benefit from the Bureau

of Prison's (BOP) Residential Drug Treatment Program (RDAP).  He is also interested in any

education or training he can get while in BOP custody. Thus, a portion of his prison sentence is

necessary to provide him with the required treatment and to further his educational goals.

**C.      The Kinds of Sentences Available**

A mandatory minimum two-year sentence is required for the aggravated identity

offense, Count Two.  Count Three, a felon-in-possession count,  includes a Section 3147

15

enhancement.  Under 18 U.S.C. § 3147 a sentence of imprisonment must be imposed in

addition to the sentence for the underlying offense and run consecutively to any other

sentence.  See Sentencing Guideline § 3C1.3, Application Note.  The "total punishment" or

sentence should however, be in accord with the guideline range for the offense committed.

**D.       The Kinds of Sentences and the Guideline Sentencing Range Established**

Although the impact of the guidelines on a Court's sentencing discretion has been

discussed already, the critical question in Jacquavius' case is the exact weight this Court should

give to the guidelines. As recognized in *Gall*, district courts "may not presume that the

Guidelines range is reasonable." 552 U.S. at 49, 128 S. Ct. at 597. Thus, mitigating

circumstances and substantive policy arguments that were formerly irrelevant in all but the

most unusual cases are now potentially relevant in every case. The guidelines pose a particular

risk in Jacquavius' case for a more elemental reason – they falsely provide a promise of

predictability and fairness. Regarding the false promise of the guidelines, one district court

aptly noted:

Criminal behavior can fuel public outcry and drive broad legislative and executive

agendas to get "tough on crime." But how does that translate to specific instances? If you take

a matrix to factor offense severity, overlay it with mandates born of popular outrage, and tailor

it purportedly to address almost every eventuality, you get "justice" dictated in advance,

marked by visceral condemnation, and based on the pretense of omniscience.

*United States v. Williams*, 372 F.Supp.2d 1335, 1337-1338 (M.D. Fla. 2005) (Presnell, J.).

 Because we believe the guidelines to be the product of great deliberation and reasoned

judgment, we often assume that they provide clear direction for the proper sentencing of every

criminal defendant, notwithstanding their backgrounds and the particular circumstances of their case.  Thus, we depend on the guidelines to relieve us of the burden and uncertainty of having to decide a just sentence for the particular defendant.  In effect, the guidelines, with their promise of mathematical certainty, provide a court with a sheltering sky against the purported abyss of ambiguity.   But such security is a false god and every time we make a sacrifice to it we are lost.   Indeed, the guideline ranges have often and dramatically failed our system of justice in creating results that are fundamentally unjust. For instance, for years, the guidelines for crack cocaine created a situation where defendants were harshly and unfairly sentenced.

> **E.    The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.**

.

As this Court has recognized, there is an obvious disparity in the number of Black defendants that have been charged with Aggravated Identity Theft.  See Exhibit E, Transcripts from Sentencing in *U.S. v. Nembhard*, pgs. 14-15.  Here, the government could have charged Jacquavius with bank fraud, wire fraud, or loan fraud which would have scored him less than a twenty-four month minimum mandatory sentence for a loss of $10,216.  Roughly a sentence of 18-14 month (Offense Level 9, Criminal History Category III).  If in fact, non-Black defendants who stole $10,216 are getting lighter sentences because they are not being charged with Aggravated Identity Theft then a downward variance must be applied.

> **F.    The Need to Provide Restitution to Any Victims of the Offense.**

 Restitution is owed to the United States for the fraudulent loan.  Jacquavius has the ability to pay this amount.

**CONCLUSION**

As the foregoing establishes, the unique circumstances presented in Jacquavius's case warrant either a downward departure or a variance below the applicable guideline range. Ideally, he would ask for a term of imprisonment at or below 60 months. Because the decision in *Booker* has made the Guidelines advisory and the parsimony clause of 18 U.S.C. § 3553(a) the paramount consideration, Jacquavius submits that a variance is appropriate pursuant to this significant and paramount sentencing statute. Indeed, an advisory guideline sentence is not only antagonistic to § 3553, but also would the violate the admonition that any sentencing must consider the individual defendant and the unique circumstances that mitigate his crime and punishment.

/s/ Dan Eckhart
Dan Eckhart, Esq.
Florida Bar Number 488674
Dan Eckhart Law
200 East Robinson, Suite 1150
Orlando, Florida 32801
Telephone 407-203-3730
Facsimile 407-513-4146
Email: dan@daneckhartlaw.com

/s/ David Bigney
David Bigney, Esq.
Florida Bar Number 132454
Bigney Law Firm
215 East Livingston Street
Orlando, Florida 32801
Telephone 407.425.6068
Facsimile 407.425.6078
Email: dbigney@bigneylaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel in this case on December 8, 2021.


/s/ Dan Eckhart
Dan Eckhart, Esq.

/s/ David Bigney
David Bigney, Esq.